# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 92-CA-01224-SCT

*ERNEST B. MORRISON*

*v.*

*MIKE MEANS*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/03/92 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RICHARD L. JONES |
| ATTORNEY FOR APPELLEE: | JOHN RAYMOND TULLOS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 9/5/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/26/96 |

**BEFORE DAN LEE, C.J., PITTMAN AND ROBERTS, JJ.**

**PITTMAN, JUSTICE, FOR THE COURT:**

¶1. As the appellant noted, "this case presents the Court with the questions of whether failed expectations and honest misunderstandings between two men not versed in the intricacies of commercial law give rise to an award of damages for mental anguish when evidenced only by the plaintiff's testimony of lost sleep."

¶2. Mike Means purchased a water filter and magnets through Earnest Morrison for installation in chicken houses owned by Means and his wife. Though the parties disagree as to when Means first objected to the water filter and whether Morrison represented the magnet manufacturer at the time of Means' magnet purchase, there is no doubt that Means ultimately demanded a refund of all monies he parted with in purchasing the products.

¶3. Morrison attempted in good faith to refund Means the most Morrison believed he could possibly owe. His refund was rejected. Means sued, claiming money damages for breach of contract, misrepresentation and mental anguish. A jury trial was had. Counsel for Morrison moved for directed verdicts at the close of Means' case in chief and again after all evidence was presented to the jury. Both motions were denied. Means was awarded a $5,000 judgment, an amount that is $3,543.20 greater than the amount he parted with in purchasing the filter and magnets. Morrison, aggrieved by the decision of the court below, perfected his appeal to this Court assigning the following as error:

## I. THERE WAS NO EVIDENCE SUFFICIENT TO SUPPORT AN AWARD OF DAMAGES FOR MENTAL ANGUISH.

¶4. This Court holds that this assignment of error is well taken and the case is reversed and remanded.

## FACTS

¶5. Morrison marketed two types of products to poultry farmers -- water filters and magnets. The water filters were manufactured by Eco Resources, and the magnets were distributed by a company operating under the name of Magnetic Marketing Group. Morrison's relationship with each company was not formal; he simply attended meetings sponsored by the companies and qualified to sell their products. The water filters were intended to remove chlorine, lead and other contaminants from water piped into poultry houses. Different magnets were marketed for a number of purposes, including the clean and efficient use of water and of fuel in the operation of chicken houses.

¶6. In April of 1990, Means purchased a water filter from Morrison. The two agreed Means would be allowed to purchase the water filter on a conditional basis: he made a $500 down payment on the purchase price, was allowed several months to evaluate the filter's performance, and then had the option to either pay the balance due or return the filter in exchange for a complete refund. Means used the water filter for several months without complaint; however, as the chickens grew, so as to require more drinking water, and as the season turned to summer, so as to require cooling by means of evaporative foggers, Means complained that the filter unacceptably restricted the water pressure required for the chicken houses.

¶7. All efforts made to remedy the problem ultimately proved unsatisfactory to Means. At trial, Means testified that by mid-summer 1990 he first requested a refund of his $500 down payment. In contrast, Morrison testified that after the modifications in April of 1990, Means voiced no more complaints regarding the water filter until shortly before the filing of the underlying lawsuit.

¶8. In the early Spring of 1990 (contemporaneous with installation of the water filter), Morrison first provided magnets to Means for use on one fuel line to the heater in a chicken house. The magnets were provided on a trial basis in order to allow Means to evaluate their effectiveness. The magnets were placed on the fuel line for the purpose of increasing the efficiency with which the chicken house was heated. Means testified that, based upon his records as to the historical cost of heating the chicken house, the magnets worked. Means never paid any money for this group of magnets. At the time of trial, they were still installed in his chicken house.

¶9. In January of 1991(approximately the time heating poultry houses again gained significance) Means contacted Morrison in regards to purchasing magnets for the fuel lines in the remainder of his chicken houses. Morrison testified at trial that he had ceased selling water filters and magnets altogether. He further testified that he agreed to arrange for the purchase of additional magnets through the company he previously represented as an accommodation to Means. In return, he was to receive $100 from Means for his costs and labors. Morrison testified that Means knew Morrison was no longer a distributor for the magnet company. Means, however, testified that he had no knowledge that Morrison was not a representative of the magnet company until the time of trial. Regardless, the testimony of both parties established that Morrison wrote a check to Means in the amount of the

purchase price of the magnets plus $100. Morrison in turn purchased money orders for the amount of the purchase price made payable to the magnet company.

¶10. The magnets actually received by Means differed from those ordered through Morrison. The magnets Morrison installed on the fuel line in the Spring of 1990 were identified under the product codes "M2" and "FE1." The 21 magnets Means later purchased were Model "FC Petro-Plus," a model with which Morrison had no familiarity. Means dealt directly with the manufacturer, and unbeknownst to Morrison, agreed to the substitution of the "FC-Petro Plus" magnets in light of the company's inability to supply the magnets actually ordered. It was not until sometime later that Morrison first learned from Means that Means had accepted magnets different from those previously provided on a trial basis. Dissatisfied with the 21 "FC Petro-Plus" magnets, Means demanded a further refund from Morrison.

¶11. In his suit Means demanded a refund not only of the $956.80 (including Morrison's $100 fee) paid for the 21 magnets, but also the $500 down payment on the water filter. Morrison refused to refund the $856.80 paid to Magnetic Marketing Group. He was willing to refund the $100 Means paid for Morrison's effort and expense. And he was willing to refund the $500 down payment on the water filter. However, from this total of $600 he deducted $340 -- his cost for the magnets Means admitted were provided on a trial basis, admitted worked, and admitted he never paid for. Morrison executed and mailed a check in the amount of $260 to Means. Means never cashed the check.

### I. WAS THERE EVIDENCE SUFFICIENT TO SUPPORT AN AWARD OF DAMAGES FOR MENTAL ANGUISH.

¶12. Mental anguish[1] is a nebulous concept (yet, all of us have suffered such anguish) and requires substantial proof for recovery. The standard required for mental anguish is elusive. However, the Restatement (Second) of Torts likens it to that required for entitlement to an award of punitive damages. It requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46.

¶13. This Court has held that recovery for mental anguish can be allowable even when there is no presence of a physical injury.

> Where there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally - or even unintentionally yet the results being reasonably foreseeable - Courts can in certain circumstances comfortably assess damages for mental and emotional stress, even though there has been no physical injury.

*Sears, Roebuck & Co. v. Devers*, 405 So. 2d 898, 902 (Miss. 1981). Stated another way, "the standard is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." *Leaf River Forest Products, Inc. v. Ferguson*, 662 So. 2d 648, 659 (Miss. 1995). If there is outrageous conduct, no injury is required for recovery for intentional infliction of emotional distress or mental anguish. *Id.* If the case of ordinary garden variety negligence, the plaintiff must prove some sort of injury, whether it be physical or mental. *See Wirtz v. Switzer*, 586 So. 2d 775, 784 (Miss. 1991); and *Devers*, 405 So. 2d at 902. If the conduct is not malicious, intentional or outrageous, there must be some sort of demonstrative harm, and said harm

must have been reasonably foreseeable to the defendant. ***Strickland v. Rossini***, 589 So. 2d 1268, 1275 (Miss. 1991).

¶14. The first aspect we must consider is what type of conduct occurred between Morrison and Means. Morrison argues that he conducted himself like "an honest farmer who expects a man's handshake to be every bit as significant as his signature at the bottom of a contract." It is Morrison's argument that he allowed Means to use his products on a trial basis, he afforded Means generous payment terms, and he assisted Means in securing additional magnets at Means' request.

¶15. Morrison contends that Means' distress does not rise to the level of anxiety or anguish required to support an award for emotional distress. Means asserts that Morrison's injurious conduct was the refusal to honor a guaranteed refund. It was this alleged refusal that Means claims caused him the stress and anxiety of trying to determine how he could make ends meet without the refund. As a young farmer, Means states that the refund (he claims to be $1,456.80) was a significant part of his family's income. This loss, Means asserts, caused him emotional strain and many sleepless nights.

¶16. There is no other evidence in this case to support a claim for mental anguish. The only evidence of Morrison's conduct was that he did not refund the entire $1,456.80 requested by Means. This is not willful, wanton, grossly careless behavior. Moreover, the evidence tends to support Morrison's explanation of the amount he offered Means as a refund. If anything, the evidence shows that Morrison tried to accommodate Means. Morrison testified at trial that he agreed to arrange for the purchase of additional magnets through the company he previously represented as an accommodation to Means. Thereafter, Means dealt directly with the manufacturer of the magnets.

¶17. The magnets actually received by Means differed from those ordered through Morrison. The magnets Morrison installed on the fuel line in the Spring of 1990 were identified under the product codes "M2" and "FE1." The 21 magnets Means purchased were Model "FC Petro-Plus," a model with which Morrison had no familiarity. Means dealt directly with the manufacturer, and unbeknownst to Morrison, agreed to the substitution of the "FC-Petro Plus" magnets in light of the company's inability to supply the magnets actually ordered. It was not until sometime later that Morrison first learned from Means that Means had accepted magnets different from those previously provided on a trial basis. Dissatisfied with the 21 "FC Petro-Plus" magnets, Means demanded a further refund from Morrison, not the manufacturer he had been dealing with. Morrison's conduct simply does not rise to the level of "malicious, intentional, willful, wanton, grossly careless, indifferent, or reckless." ***Leaf River***, 662 So. 2d at 659.

¶18. Even if this Court were to find Morrison's conduct to be of such a nature to meet the standard set by our precedent, there is not enough evidence presented to support the claim of mental anguish as a result of the conduct due to a lack of an injury. Means testified that he lost some sleep. He stated that,

> [i]t has affected me emotionally in that I have not been able to sleep many nights because I feel like I've been done wrong. I've been cheated out of money that I need to help support my family.

These two sentences out of the entire transcript offered in support of this claim are hardly enough evidence to support a verdict that amounts to $3543.20 in damages for mental anguish.

¶19. In *Strickland v. Rossini*, 589 So. 2d 1268 (Miss. 1991), we held that evidence that the plaintiff was "very depressed . . . [and] very upset over all this and emotional. . . . [and] **not able to sleep**," was insufficient to sustain a damages for mental anguish. *Strickland*, 589 So. 2d at 1275-76 (emphasis added). The testimony towards mental anguish in the *Strickland* case was the equivalent, if not more convincing, to that in the case *sub judice*. However, we did not find it adequate enough to support the award of damages for mental anguish, nor can we now hold that the evidence in the case at hand supports an award of damages for mental anguish. The jury below was erroneous in its award of damages.

¶20. Under our prevailing case law, there is no evidence of mental anguish in this case. Morrison's conduct did not reach the level of outrageous conduct this Court has required for mental anguish. Moreover, Means did not prove any evidence of an injury resulting from Morrison's conduct. Thus, the jury verdict of $5,000 must be reversed and the case remanded.

¶21. **REVERSED AND REMANDED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., BANKS, ROBERTS, SMITH, AND MILLS, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**


**McRAE, JUSTICE, DISSENTING:**


¶22. By imposing an "outrageous conduct" requirement upon the defendant's actions when extra-contractual damages are sought, the majority raises the standard of proof for emotional distress in contracts cases to the same level as that required for an award of punitive damages. This is contrary to our well-established line of cases requiring only the showing of an intentional tort independent from the breach of contract to establish damages for emotional distress. Accordingly, I dissent.

¶23. When the issues of emotional distress and punitive damages have arisen in breach of contract cases, most often in the context of insurance contracts, we have drawn a line between these two very distinctive types of extra-contractual damages, often recognizing that compensation for emotional distress -- anxiety, insomnia and the like -- may be warranted even when an award for punitive damages is not. *Universal Life Insurance Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992); *Pioneer Life Insurance Co. of Illinois v. Moss,* 513 So. 2d 927, 931 (Miss. 1987)(Robertson, J., concurring, joined by Prather and Anderson, JJ.); *Id.* at 932 (Sullivan, J., concurring, joined by D. Lee, Prather and Robertson, JJ.). In *Veasley*, the majority stated "damages for mental anguish and emotional distress cannot be considered in the absence of a finding of an independent intentional tort separate from the breach of contract." *Id.* at 295. "Who ever heard of a tort where the plaintiff was not entitled to recover such damages as he may prove by defendant's tortious conduct? Such damages ought include economic loss (including attorney fees and legal expenses reasonably and necessarily incurred) **and emotional distress.**" *Moss,* 513 So. 2d at 931(emphasis added). In *Continental Casualty Co. v. Garrett*, 161 So. 753, 755 (1935), where an insured's illness was exacerbated by emotional distress suffered after his agent went to his home and called him a liar, the Court found that "we have (1) an actionable tort; (2) an injury as a proximate result thereof; (3) a situation then

and there known to the wrongdoer from which he should have anticipated the injury as the natural and probable consequence of his conduct."

¶24. The majority in *Veasley* found that simple negligence did not rise to the level of an independent intentional tort for purposes of supporting extra-contractual damages. *Veasley,* 610 So. 2d at 295. However, the insurer's bad faith refusal to pay Mrs. Veasley's claim was found to be an independent intentional tort warranting the award of damages for emotional distress -- the anxiety, worry and insomnia she suffered as a result of the insurer's actions -- even though the majority determined that there was no evidence of "wanton or gross conduct" to put the issue of punitive damages before a jury. *Id.* at 295-296. In *Garrett,* the court not only found that agent's trespass and insulting words had caused the insured's emotional distress, but separately found that his conduct was so "wanton and willful" as justify the jury's award of punitive damages. *Garrett,* 161 So. at 755. Only in its discussion of punitive damages did the Court consider the "willfulness of the wrong and injury." *Id.*

¶25. In *Strickland v. Rossini,* 589 So.2d 1268 (Miss. 1991), where breach of contract was not involved, we rejected appellant Redd Pest Control's argument that the lower court erred in not instructing the jury that its actions in failing to thoroughly treat the plaintiff's house for termites must be willful, intentional, wanton or otherwise grossly negligent. *Strickland,* 589 So. 2d at 1275. To the contrary, the Court stated that the rule requiring a showing of gross negligence had been relaxed by a long series of cases including *First National Bank v. Langley,* 314 So. 2d 324, 328 (Miss. 1975), *Sears, Roebuck & Co. v. Devers*, 405 So. 2d 898, 902 (Miss. 1981) and *Royal Oil Co. v. Wells,* 500 So. 2d 439, 448 (Miss. 1986). *Id.* "The upshot of these cases in the present rule is," the *Strickland* Court wrote, "a plaintiff may recover for emotional injury proximately resulting from negligent conduct, providing only that the injury was reasonably foreseeable by the defendant." *Id.*

¶26. Because there is no precedent for requiring a showing of willful, wanton or grossly negligent behavior to award extra-contractual damages for emotional distress and further, I respectfully dissent.

1. This Court has applied the same standard for mental anguish and intentional infliction of emotional distress. *See Leaf River Forest Products v. Ferguson*, 662 So. 2d 648, 659 (Miss. 1995)(applying the standard stated in *Sears, Roebuck & Co. v. Devers*, 405 So. 2d 898 (Miss. 1981) in support of the standard for intentional infliction of emotional distress). Thus, this Court will use the words interchangeably.