# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-00233-SCT

*CONSTRILLA WASHINGTON WILSON*

*v.*

*GENERAL MOTORS ACCEPTANCE CORPORATION AND AMERICAN LENDERS SERVICE COMPANY OF JACKSON, MISSISSIPPI, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2002 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | CLAIBORNE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GERALD PATRICK COLLIER |
| ATTORNEYS FOR APPELLEES: | VICTOR A. DUBOSE |
| | DEREK ROYCE ARRINGTON |
| | JOE S. DEATON, III |
| | JOSEPH BLAIR LOBRANO |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 07/29/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., EASLEY AND RANDOLPH, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.     On January 8, 1999, Constrilla Washington Wilson (Wilson) filed suit in the Circuit County of Claiborne County (trial court) against General Motors Acceptance Corporation (GMAC), ***Constrilla Washington Wilson v. General Motors Acceptance Corp.***, Cause No. 99-0002.  The suit alleged wrongful repossession, conversion and tortious breach of contract regarding a 1995 Ford Mustang which had been purchased by Wilson's husband, James E. Wilson (James), and financed by GMAC.  Wilson was

not a party to the purchase contract for the Ford Mustang with GMAC. GMAC removed the case to the United States District Court of Southern District of Mississippi, Western Division (federal court), Civil Action No. 5:99-CV-88WS, arguing that Wilson refused to admit in admissions propounded by GMAC that she would not seek damages in excess of the minimum federal jurisdictional amount of $75,000 for diversity of citizenship cases and that her claim did not exceed $75,000. Wilson's complaint also demanded a judgment against GMAC in the amount of $75,000, and any other relief which the court or jury deemed just and appropriate. On Wilson's motion to remand, United States District Judge Henry T. Wingate remanded the case to circuit court based on Wilson providing an affidavit stating that she would not seek damages in excess of $75,000 in the lawsuit.

¶2. On July 24, 2000, Wilson filed a separate suit for wrongful repossession and conversion in the Circuit Court of Claiborne County against American Lenders Service Company of Jackson, Mississippi, Inc. (American Lenders), *Constrilla Washington Wilson v. American Lenders Service Company of Jackson, Mississippi, Inc.*, Cause No. 2000-159. American Lenders was the repossession company used by GMAC.

¶3. GMAC again removed the action to federal court based on Wilson's deposition testimony that "in her head" the case was worth $80,000, but she acknowledged that she signed the affidavit for $75,000 and sought only $75,000. In Civil Action No. 5:00-CV-317LN United States District Judge Tom S. Lee remanded the case back to circuit court based on Wilson's acknowledgment in her affidavit that she did not seek in excess of $75,000 against GMAC.

¶4. On Wilson's motion the trial court consolidated the cases against GMAC and American Lenders and set the consolidated case for trial. On January 17, 2002, the jury returned its verdict against GMAC "guilty of breach of contract" and "guilty of conversion" assessing compensatory damages against GMAC

in the amount of $2,500,000. The jury returned its verdict against American Lenders finding it "guilty of breach of the peace" and assessing compensatory damages in the amount of $1,000,000. The trial court *immediately* reduced the verdict against GMAC to $75,000 consistent with Wilson's affidavit and entered its final judgment on March 7, 2002.[1]

¶5.     Wilson filed a motion to alter or amend the final judgment. Wilson argued the trial court should not have reduced the judgment against GMAC to $75,000. Wilson contended that "seek" and "recover" are very different terms, thereby, not precluding her from recovering the jury award of $2,500,000 despite her affidavit to not seek in excess of $75,000 against GMAC. The trial court denied Wilson's motion.

¶6.     The trial court granted American Lenders' and GMAC's motion for JNOV, and it denied GMAC's motion for mistrial.[2] The trial court set aside the $1,000,000 jury verdict against American Lenders and the $75,000 judgment against GMAC.[3] The trial court stated:

> There were two jury verdicts in this case. One against Defendant, GMAC, for $2.5 million dollars, which was reduced to $75,000.00, as per the agreement that Plaintiff would not seek more than $75,000 and one against Defendant, American Lender, for $1 million dollars. This Court must look at the facts of the individual case to see if the facts rise to the level to provide a basis where upon the Court could assume that either of the Defendant's actions were so outrageous or the type to evoke revulsion, thereby allowing the Plaintiff to not have to put forth evidence of her mental anguish/distress against both Defendants. The Court must also look to see if the repossession was done in a manner that would constitute a breach of the peace or conversion. The last thing that the Court must decide is if reasonable men could have differed whether there was a breach of contract. The facts here are that the Plaintiff's car was repossessed allegedly without her

---

[1] The trial court stated in its memorandum opinion that "Defendant, GMAC, did not give a jury instruction on capping damages at $75,000.00 due to the agreement that the Plaintiff was not seeking damages in excess of $75,000.00."

[2] Apparently, GMAC contended that Wilson knew one of the jurors. The trial court denied GMAC's post-trial motion for mistrial. However, the trial court eliminated the entire judgment against GMAC and American Lenders on other grounds.

[3] The trial court had previously reduced the $2,500,000 jury verdict against GMAC to $75,000.

approval, previous to this she had asked for and was granted an extension payment, after the repossession there is confusion as to if she told GMAC that it was ok to keep the car. Plaintiff did not put on any evidence that the repossession by American Lenders was done in a manner inconsistent with the statute, or that they breached the peace. There is no confusion that GMAC was told by different people, one being the Plaintiff's previous attorney, who swore out an affidavit AND testified that the Plaintiff told him to tell GMAC to keep the car and send her a refund, the others being the relatives of the deceased that were listed on the Mustang's financial paperwork, to keep the car. The evidence also shows that after the Mustang was repossessed, the Plaintiff cashed an extension payment refund check sent to the Plaintiff by GMAC. As to Plaintiff's claim of breach of contract, by cashing the extension payment refund check, Plaintiff was put back in as good of a position, or possible a better one, then she would have been had the contract not been formed. Plaintiff failed to put on evidence to support punitive damages for breach of contract since she did not show that Defendant's actions were "intentional and so egregious as to descend to a level of an individual tort." The only evidence that the Plaintiff put on concerning mental distress was her comments that she lost sleep, was upset, and had nightmares about the repossession. Plaintiff failed to put forth any credible evidence that the repossession was done in a manner that would be considered a breach of the peace, nor was there any evidence put forth that the Plaintiff was threatened by the Defendant, American Lenders Service Company of Jackson. Since there is not any evidence that would support an unbiased jury finding of past, present, and/or future emotion distress or breach of peace, conversion, breach of contract, or punitive damages for breach of contract, a Judgment Notwithstanding the Verdict should be granted on behalf of the Defendants, GMAC and American Lenders.

**FACTS**

¶7.    On October 31, 1995, James purchased a 1995 Ford Mustang which he financed through GMAC. Only James's name appeared on the GMAC purchase agreement. At the time of the purchase, James was not married. Wilson did not marry James until June 7, 1997. Wilson's name did not appear on any of the GMAC paperwork. James had listed his sister, Patricia Wilson (Patricia), and his parents, Archie and Tarisha Wilson, as contact persons.

¶8.    On November 20, 1997, James died in an automobile accident not involving the Mustang. Following James's death, his sister, Patricia, and his mother contacted GMAC on December 2, 1997, and December 31, 1997, to have GMAC pick up the Mustang. On December 2, 1997, James's mother

4

informed GMAC that James had been killed in an automobile accident and that it should pick up the Mustang. On December 31, 1997, Patricia informed GMAC that James was killed in an automobile accident on November 20, 1997, that his wife could not afford the payments, and that is should pick up the Mustang.[4] Patricia provided directions to pick up the Mustang.

¶9.    On December 11, 1997, J.B. Brown (Brown), collection supervisor for GMAC, requested permission to issue a request for repossession based on the telephone call from Patricia that James's girlfriend was driving the Mustang without a driver's license.[5] GMAC supervisor, Pat Reed (Reed), authorized the repossession on January 5, 1998, and she authorized American Lenders to perform the repossession.

¶10.    Wilson contacted GMAC in mid-December 1997, requesting an extension on James's account. GMAC agreed to the extension, and Wilson paid GMAC via money order dated December 12, 1997, for the extension agreement on James's account. The Mustang payments were due on the 10th of each month and had not been paid for November and December of 1997.[6]

¶11.    On January 6, 1998, Wilson purchased a new 1998 Saturn SL2 vehicle from Herrin-Gear Autoplex in Jackson, Mississippi.[7] Wilson purchased the Saturn with her sister, Hedrick. Monthly

---

[4] The record reflects that Patricia also represented to GMAC and American Lenders that Wilson was James's "girlfriend," not his wife.

[5] The record demonstrates that James's family contested the validity of his marriage to Wilson in other proceedings. James's family even sought to have the marriage annulled.

[6] The written extension agreement in the account name of "James E. Wilson" contained in the record is dated January 9, 1998, extending payments until March 10, 1998. However, the Mustang was repossessed before the written extension agreement was drafted. The Mustang was repossessed on January 8, 1998.

[7] Wilson used her maiden name, Washington, on the paperwork purchasing the Saturn.

5

payments on the Saturn were $320 per month as opposed to the $600.42 per month payments on the 1995 Mustang which had a balance of approximately $19,578.18.[8] Hedrick testified that she helped Wilson purchase the Saturn. Hedrick's involvement in the purchase of the Saturn for Wilson was because her credit status was necessary in order to finance the Saturn. Hedrick testified that she helped Wilson purchase the Saturn because she was in a financial challenge and did not have the money to pay for the Mustang.

¶12.    GMAC had furnished American Lenders with documentation requesting repossession of a purple 1995 Ford Mustang, vin # 1FALP42795SF161881. Patricia was listed as the person to contact for directions. On January 8, 1998, American Lenders' repossession agent, Clayton Gay (Gay), contacted Patricia for directions to her home. Gay followed Patricia to Wilson's home. The two repossession agents waited until Wilson returned home to repossess the Mustang. Wilson was driving the new Saturn.

¶13.    On January 9, 1998, Wilson telephoned Reed. According to Reed's written account of the conversation, Wilson stated that she was getting a cheaper car and could not afford the payments on the Mustang. She informed Reed to keep the Mustang. Reed told Wilson that Patricia called them identifying herself as James's guardian and requesting that GMAC pick up the Mustang. Wilson verified to Reed that Patricia was James's guardian and that she did not want the car.

¶14.    Brown's memorandum dated January 9, 1998, provides that Wilson's attorney, Sim Clarence Dulaney (Dulaney), from Port Gibson, telephoned GMAC. Dulaney initially told Brown that Wilson's car had been picked up and she wanted it back. Brown informed Dulaney that Wilson had just called GMAC and told them to keep the car. Dulaney conferred with Wilson who was in his office and stated that she

---

    [8] The written extension agreement dated January 9, 1998, lists the monthly payments on the Mustang as $502.74 per month with remaining payments totaling $19,578.18.

6

did not want to keep the car. Wilson requested a refund of her $326.17 extension payment. GMAC mailed the refund to Wilson via certified mail. Wilson cashed the full refund of the $326.17 extension payment.

¶15. Dulaney provided an affidavit that on January 9, 1998, that he met with Wilson regarding the repossession of James's car. Dulaney also testified at trial to the same information provided in his affidavit. Dulaney stated that he was initially under the impression that Wilson wanted the car back. While Wilson was in his office, he called GMAC. The GMAC agent informed Dulaney that Wilson had called GMAC and told them to keep the car. Wilson confirmed to Dulaney that was true and stated that she could not afford the car. Dulaney then informed GMAC that was correct, and he told GMAC that Wilson did not want the car. Dulaney requested a refund of the extension agreement payment.

¶16. In Reed's affidavit, she stated that on January 9, 1998, Wilson telephoned regarding the repossessed car. Wilson informed Reed that GMAC could keep the car and that she could not afford it. Reed stated that she informed Wilson that they picked up the car based on information by Patricia who identified herself as James's guardian. Wilson verified that Patricia was James's guardian.

¶17. Brown's affidavit provided that he had spoken to Wilson's attorney, Dulaney, on January 9, 1998, regarding the repossessed 1995 Mustang. After Dulaney conferred with Wilson, he stated that Wilson did not want to keep the car. Wilson requested a refund of the $326.17 extension payment. A check was issued and mailed to Wilson.

¶18. GMAC sent a letter dated January 12, 1998, to the Estate of James E. Wilson, regarding the repossessed car.[9] The letter provided that the vehicle would be held by American Lenders until January 23, 1998, after which it would be sold if not redeemed.

---

[9] The address on the letter is the same address that also appeared on Wilson's driver's license.

7

¶19. The Mustang was not redeemed and was sold for $7,250. The Mustang had a $19,578.18 obligation at the time of the sale.

¶20. Wilson now appeals raising the following assignment of errors:

  I.   **Whether the trial court erred in granting GMAC's motion for JNOV.**

  II.  **Whether the trial court erred in granting American Lenders' motion for JNOV.**

  III. **Whether the trial court erred in denying Wilson's motion to alter or amend the judgment.**

  IV.  **Whether the trial court erred in not submitting the issue of punitive damages to the jury.**

## DISCUSSION

## JNOV Standard of Review

¶21. Issues I and II require us to examine the trial court's decision to grant JNOV on behalf of GMAC and American Lenders. Therefore, a review of the standard of review is helpful before examination of trial court's decision. A motion for JNOV made under the procedural vehicle of M.R.C.P. 50 (b), requires the trial court to test the legal sufficiency of the evidence supporting the verdict, not the weight of the evidence. *Tharp v. Bunge Corp.*, 641 So.2d 20, 23 (Miss. 1994). *See* M.R.C.P. 50 (b). In order to rule on a motion for JNOV, the trial court is required to consider the evidence in the light most favorable to the non-moving party, giving that party the benefit of all favorable inferences that reasonably may be drawn therefrom. *Corley v. Evans*, 835 So.2d 30, 36 (Miss. 2003) (quoting *Goodwin v. Derryberry Co.*, 553 So.2d 40, 42 (Miss. 1989)).

¶22. "If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render." *Corley*, 835 So.2d

8

at 37. *See also* **Steele v. Inn of Vicksburg, Inc.**, 697 So.2d 373, 376 (Miss. 1997); **Bankston v. Pass Road Tire Ctr., Inc.**, 611 So.2d 998, 1003 (Miss. 1992); **McMillan v. King**, 557 So.2d 519, 522 (Miss. 1990). Furthermore, when the plaintiff fails to establish a prima facie case showing the elements of the cause of action, JNOV is proper. **Bankston,** 611 So.2d at 1001.

¶23. "On the other hand, if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required." **Corley**, 835 So.2d at 37. *See also* **McMillan**, 557 So.2d at 522.

¶24. In reviewing a circuit court decision on a motion for JNOV, this Court does not defer to the circuit court's decision but rather reviews the matter de novo. **Northern Elec. Co. v. Phillips**, 660 So.2d 1278, 1281 (Miss. 1995).

## I. GMAC's Motion for JNOV

¶25. This Court finds the trial court properly granted GMAC's motion for JNOV setting aside the $75,000 verdict against GMAC due to the lack of evidence presented by Wilson to support recoverable damages.[10]

### A. Emotional Distress

#### 1. Ordinary Negligence

¶26. Wilson's complaint for damages was based on a claim of emotional distress which consisted primarily of loss of sleep. Wilson neither sought nor received any medical treatment or professional counseling regarding her alleged emotional distress. In Wilson's testimony at trial when asked how the

---

[10] The trial court immediately reduced the $2,500,000 jury verdict to $75,000.

9

repossession affected her emotionally, she stated "I can't sleep or anything from thinking about what occurred that night, everything that happened." Wilson also stated that she had "my pastor, my copastor pray with me."

¶27. "Mental anguish is a nebulous concept and requires substantial proof for recovery." *Morrison v. Means*, 680 So.2d 803, 805 (Miss. 1996). This Court applies the same standard for mental anguish and intentional infliction of emotional distress. *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So.2d 648, 659 (Miss. 1995) (applying *Sears, Roebuck & Co. v. Devers*, 405 So.2d 898 (Miss. 1981)). The Court uses the words interchangeably. *Morrison*, 680 So.2d at 805, n.1. In asserting a claim for mental anguish, whether as a result of simple negligence or intentional, the emotional distress must be proved to be a reasonably foreseeable result of the defendant's conduct. *Adams v. U.S. Homecrafters, Inc.*, 744 So.2d 736, 743 (Miss. 1999).

¶28. In *American Bankers' Ins. Co. of Fla. v. Wells*, 819 So.2d 1196, 1208 (Miss. 2001), we noted:

> We have usually followed the majority view that, in order to recover for mental anguish unaccompanied by demonstrable physical or mental injury, the defendant's conduct must be malicious, intentional, willful, wanton, grossly careless, indifferent or reckless. *Mississippi Valley Gas Co. v. Estate of Walker*, 725 So.2d 139, 148 (Miss. 1998); *Morrison v. Means*, 680 So.2d 803, 806 (Miss. 1996). In these cases, where the defendant's conduct rises only to the level of ordinary negligence, the plaintiff must prove some sort of injury or demonstrable harm, whether it be physical or mental, and that harm must have been reasonably foreseeable to the defendant. *Walker*, 725 So.2d at 148; *Morrison*, 680 So.2d at 805 n. 1.
>
> In another line of cases, we have demonstrated an intent to "relax" the standard of proof in emotional distress cases and follow the minority view that a plaintiff may recover for emotional distress and mental anguish proximately resulting from ordinary negligence, provided only that the injury was reasonably foreseeable by the defendant. *Southwest Miss. Reg'l Med. Ctr. v. Lawrence*, 684 So.2d 1257, 1269 (Miss. 1996); *Universal Life Ins. Co. v. Veasley*, 610 So.2d 290, 295 (Miss. 1992); *Strickland v. Rossini*, 589 So.2d 1268, 1275 (Miss. 1991). Even in this more permissive line of

10

cases we have required a heavy burden of proof in order to establish a right to recover emotional distress damages.

¶29. We concluded that "a plaintiff therefore may not recover emotional distress damages resulting from ordinary negligence without proving some sort of physical manifestation of injury or demonstrable physical harm." *American Bankers'*, 819 So.2d at 1209. *See Ill. Cent. R.R. v. Hawkins*, 830 So.2d 1162, 1174 (Miss. 2002) (quoting *Summers ex rel. Dawson v. St. Andrew's Episcopal Sch., Inc.*, 759 So.2d 1203, 1211 (Miss. 2000) (where there is ordinary garden variety negligence, there must be some demonstrative harm)).

¶30. In *Morrison*, like in the case sub judice, the testimony established that Means lost sleep over the incident in which he felt that he was wronged. *Morrison*, 680 So.2d at 807. The Court stated that the testimony as to the loss of sleep was not enough evidence to support a verdict of $3,543.20 in damages for mental anguish. *Id*.

¶31. Furthermore, as cited in *Morrison*, the Court in *Strickland v. Rossini*, 589 So.2d 1268, 1275-76 (Miss. 1991), stated that "very depressed ... [and] very upset over all this and emotional ... [and] not able to sleep," was insufficient to sustain an award of damages for mental anguish.

¶32. In *Adams*, 744 So.2d at 744, the Court again addressed this issue finding that "Adams's vague testimony about loss of sleep and worry caused by the drainage problem was insufficient to support an instruction or an award of damages for emotional distress." The Court in *Adams* relied upon its holdings in *Morrison* and *Strickland*. *Id*.

¶33. Therefore, based on this Court's prevailing case law, we find that Wilson's evidence was insufficient to support a claim for emotional distress for ordinary negligence.

    *2.    Outrageous Conduct*

¶34.    "The standard for mental anguish is elusive." **Summers ex rel. Dawson**, 759 So.2d at 1211.

Recovery for mental anguish can be allowable when there is not physical injury, where the defendant's

conduct is outrageous or "evokes outrage or revulsion." **Id**. "The standard is whether the defendant's

behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." **Ferguson**, 662

So.2d at 659.

¶35.    In **Gamble v. Dollar General Corp.**, 852 So.2d 5, 11 (Miss. 2003), this Court recently stated

that:

> 'If there is outrageous conduct, no injury is required for the recovery of infliction of
> emotional distress or mental anguish.' **Means**, 680 So.2d at 806 (citing **Leaf River
> Prods. Inc. v. Ferguson**, 662 So.2d 648, 659 (Miss. 1995)). The plaintiff does not
> have to present further proof of injury. The nature of the act itself, rather than the
> seriousness of the consequences, can justify an award for compensatory damages.
> **Devers**, 405 So.2d at 902.

¶36.    In the instant case, the trial court determined that the proof did not approach the level of extreme

or "outrageous" conduct required to support or sustain an award of damages for emotional distress:

> In the case sub judice, the Plaintiff argues that she does not have to prove that she suffered
> a demonstrable physical injury to recover for emotional distress. However, when this
> Court looks to the line of cases cited herein from the Mississippi Supreme Court and the
> Mississippi Court of Appeals, this Court can see that unless the facts show that either
> Defendant's conduct was outrageous, evoked revulsion, done intentionally with a
> reasonably foreseeable result, and done for the purpose of causing hardship, a claim for
> emotional distress cannot recover. The evidence in this case is in contradiction concerning
> whether the Plaintiff told the Defendants that they could keep the Mustang, however, there
> are some facts that are not in contradiction. Those included the fact that the Plaintiff did
> not put on any evidence of any economic harm suffered, actually the evidence shows that
> she received a refund of the extension payment she made, the fact that GMAC was told
> by both the mother and sister of deceased, who were both on GMAC's original
> paperwork concerning the vehicle, and the Plaintiff's original attorney, Mr. Sim Dulaney,
> that GMAC was to keep the Mustang. There is not evidence that Defendants did anything
> intentionally with a foreseeable result of harm to the Plaintiff. There is not evidence that the
> Defendants did anything that would be seen as extreme or outrageous. And except for
> Plaintiff's compliant that she lost sleep, was upset and had bad dreams, there is not
> evidence that would support a judgment for emotional distress. Under **Gamble**,

*Morrison*, and *American Bankers*, this Court holds that a judgment for emotional distress cannot rest upon just those things. GMAC was told to repossess the car by the deceased's sister and mother. GMAC was then told to keep the car by Plaintiff's original attorney and send a refund check for the extension payment, which Plaintiff cashed. None of GMAC's actions can be seen as "extreme or outrageous."

We agree.

¶37. As correctly determined by the trial court, the record does not support recovery against GMAC on Wilson's complaint of emotional distress. We find that the issue is without merit.

### B. Tortious Breach of Contract

¶38. Wilson alleged that GMAC committed a tortious breach of contract when it repossessed the Mustang.

¶39. In *Theobald v. Nosser*, 752 So.2d 1036, 1042 (Miss. 1999) (quoting *Leard v. Breland*, 514 So.2d 778, 782 (Miss. 1987)), is Court stated that "[t]he Court's purpose in establishing a measure of damages for a breach of contract is to put the injured party in the position where she would have been but for the breach." However, this Court has never contemplated that an injured party be placed in a better position than she would have been had the contract been performed. *Polk v. Sexton*, 613 So.2d 841, 844 (Miss. 1993).

¶40. Furthermore, in order to constitute tortious breach of contract as alleged by Wilson, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort must exist. *Southern Natural Gas Co. v. Fritz*, 523 So.2d 12, 19-20 (Miss. 1987).

¶41. In the case sub judice, the trial court held:

> Under Mississippi [c]ontract law, "one injured by a breach of contract is entitled to just and adequate compensation and no more." *McDaniel Bros. Const. Co. v. Jordy*, 195 So.2d 922, 925 (Miss., (sic) 1967). In *McDaniel Bros.*, the Court went on to hold:

13

The fundamental principle of the law of damages is compensation for injuries sustained. One injured by a breach of contract is entitled to a just and adequate compensation and no more. 'The law will not put him in a better position than he would be in had the wrong not been done or the contract not been broken.' ([q]uoting 22 Am.Jur.2d Damages s 13 (1965)). *McDaniel Bros.*, at 925.

In *Polk v. Sexton*, 613 So.2d 841, 844 (Miss., (sic) 1993), the Court held:

[W]hen a person has been injured by breach of contract, he or she is entitled to be justly compensated and is to be made whole by trial court; however, it is never contemplated that injured party be placed in better position then he or she otherwise would have been in if contract had been performed.

The Court had continuously held that "the Court's purpose in establishing a measure of damages for breach of contract is to put injured party in the position where she would have been but for the breach." *Theobald v. Nosser*, 752 So.2d 1036, 1042 (Miss., (sic) 1999), *A & F Properties, LLC v. Lake Caroline, Inc.*, 775 So.2d 1276, 1281 (Miss.App., (sic) 2000)....

The Plaintiff based part of her case against GMAC on breach of contract. Plaintiff states that when she asked for an extension payment on the car, she created a contract between herself and GMAC to not repossess the Mustang. However, after the Mustang was repossessed, and the Plaintiff received a refund of the extension payment, she cashed the refund check. There was not any evidence produced that Plaintiff called GMAC at that point to ask why she had received the refund check when she really wanted the car back. Instead, the Plaintiff's action was to cash the refund and keep the money.

The Plaintiff will point to the fact that she called GMAC, identified herself as the wife of the deceased, and asked for an extension payment, and not a repossession. HOWEVER, after the repossession, when she received the refund of the extension payment, she cashed it. There is no evidence that she called GMAC to ask them why they would send her this check if they were going to return the Mustang that she alleges had been wrongfully repossesses. A reasonably prudent person in the plaintiff's shoes would not have cashed the extension payment refund check, which was refunded to her since she no longer had the Mustang, which is why she had to have an extension payment. Once again, looking at all the evidence, even in the light most favorable to the Plaintiff.... the Plaintiff failed to put on any credible evidence to show that the Defendant's conduct was malicious, intentional, willful, or wanton.

Once the Plaintiff cashed the extension payment refund check and kept the money, she was put back in the position that she was originally in before the contract had been made. In keeping with *Theobald* and *A & F Properties, LLC*, this [c]ourt holds that the (sic) by cashing the refund check, Plaintiff was put back in her original position but for the breach. Under *Polk* and *McDaniel*, this [c]ourt cannot let the Plaintiff recover an amount that would put her in a better position than she would have been had the contract been performed.

¶42.    Two days before the Mustang was repossessed Wilson, with the help of her sister, Hedrick, purchased a new Saturn. Hedrick's testimony was that Wilson did not have the money to pay for the Mustang. The Saturn's monthly payments were substantially lower than those of the Mustang.

¶43.    GMAC repossessed the Mustang after receiving calls from James's sister, Patricia, who was listed on James's paperwork purchasing the Mustang. The day after the Mustang was repossessed, Wilson's original attorney, Dulaney, spoke with GMAC about the repossession. Dulaney advised GMAC that Wilson told him that she did not want the Mustang.

¶44.    Wilson requested a refund of the payment for the extension agreement. Wilson received and cashed a check for the **full** refund of the extension agreement payment. Wilson took no action in response to the letter sent by GMAC after repossession as to how to re-claim the Mustang and that it would be sold if no action was taken.

¶45.    Furthermore, when GMAC sold the Mustang for market value, it was sold for $7,250. The amount brought by the sale of the Mustang was substantially less than the $19,578.18 obligation still owed on the Mustang.

¶46.    Wilson got a complete refund of the extension agreement payment which she accepted. The evidence established that Wilson did not intend to retain the Mustang. Wilson surrendered attempts to re-claim the Mustang once it was repossessed. Despite these facts, a year later Wilson filed this suit against GMAC and over two years later against American Lenders for monetary damages. Furthermore, Wilson had use of the Mustang without making any payments on the obligation.

¶47.    Therefore, we find that the trial court did not err in finding that recovery for breach of contract was not in order as Wilson was already put back in the position she was originally in before any breach of contract. This assignment of error is without merit.

## C. Conversion

¶48.    Wilson argues that GMAC's actions violated its repossession policy and amounted to conversion of the Mustang.  GMAC contends that Wilson's intent was to abandon the extension agreement and waive her claims to the Mustang.

¶49.    Waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938).

¶50.    Ownership of the property is an essential element of a claim for conversion.  This Court has held that "[t]o make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or the defiance of **the owner's right**, or of an unauthorized and injurious use, or of a wrongful detention after demand." *Smith v. Franklin Custodian Funds, Inc.*, 726 So.2d 144, 149 (Miss. 1998) (emphasis added).  "[T]here is no conversion until the title **of the lawful owner** is made known and resisted or the purchaser exercises dominion over the property by use, sale or otherwise." *Mississippi Motor Fin., Inc., v. Thomas*, 246 Miss. 14, 149 So.2d 20, 20 (1963) (emphasis added).

¶51.    The elements of conversion have been established in Mississippi.  This Court has stated:

> It is well settled that the acts alleged to constitute a conversion must be positive and tortious.  In *McJunkin v. Hancock*, the Court said: "To make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand.  In *Spooner v. Holmes*,...the Court said: "Action of tort ... cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself, or to deprive the rightful owner of it, or destroyed the property."  In *Lee Tung v. Burkhart*, the Court held that in order to maintain an action for conversion, there must have been, on the part of the defendant, some unlawful assumption of dominion over the personal property involved, in defiance or exclusion of the plaintiff's rights, or else a withholding of the possession under a claim of right or title inconsistent with that of plaintiff.

*First Investors Corp. v. Rayner*, 738 So.2d 228, 234-35 (Miss. 1999) (quoting *Thomas*, 246 Miss. at 20-21, 149 So.2d at 23 (internal citations omitted). Thus, there is a conversion only when there is an "intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Rayner*, 738 So.2d at 234. While intent is necessary, it need not be the intent to be a wrongdoer. *Id*.

¶52. If conversion is established, the proper measure of damages is the fair market value of the property at the time and place of its conversion. *Bender v. North Meridian Mobile Home Park*, 636 So.2d 385, 390 (Miss. 1994).

¶53. Here, GMAC picked up the Mustang based on telephone calls from James's sister, Patricia, who was listed on the purchase paperwork. Wilson, with the help of her sister, had already purchased a new Saturn with monthly payments substantially lower than the Mustang. Wilson never had her name listed on the Mustang paperwork.

¶54. The day after the repossession, Wilson's attorney, Dulaney, informed GMAC that Wilson did not want to keep the Mustang. Wilson, herself, spoke with GMAC and told GMC to keep the Mustang. Wilson requested a full refund or her $326.17 extension agreement payment. GMAC complied and mailed the complete refund to Wilson. Wilson accepted and cashed the **full** refund.

¶55. GMAC sent a letter to Wilson regarding the sale of the Mustang if it was not redeemed before the day of the sale. Wilson took no action to retrieve the Mustang. The Mustang was sold for **substantially** less than was owed on the account.

¶56. Almost one full year after the repossession, Wilson sued GMAC for monetary damages. Clearly, the evidence reflects that Wilson abandoned the Mustang. Furthermore, Wilson accepted and cashed the full refund of what she paid for the extension agreement, receiving back what she had paid to GMAC. However, despite making no payments on the account, Wilson had use of the Mustang until it was

17

repossessed. And finally, the Mustang sold for considerably less than the secured obligation owed on the Mustang. Therefore, the Mustang did not bring enough to satisfy the obligation owed to GMAC.

¶57. Therefore, we find that the trial court did not err in finding that Wilson was simply not entitled to recover any damages for conversion.

## II. American Lenders' Motion for JNOV

### A. Breach of Peace

¶58. Wilson argues that the trial court erred in granting American Lenders' motion for JNOV. The jury found American Lenders guilty of "breach of peace" and awarded Wilson $1,000,000. The trial court granted American Lenders' motion for JNOV to eliminate the $1,000,000 judgment, finding that no credible evidence supported Wilson's recovery of $1,000,000 against American Lenders.

¶59. In its memorandum opinion the trial court stated:

> There were two jury verdicts in this case. One against Defendant, GMAC, for $2.5 million dollars, which was reduced to $75,000.00, as per the agreement that Plaintiff would not seek more than $75,000 and one against Defendant, American Lender, for $1 million dollars. This court must look at the facts of the individual case to see if the facts arise to the level to provide a basis where upon this court could assume that either of the Defendant's actions were so outrageous or the type to evoke revulsion, thereby allowing the Plaintiff to not have to put forth evidence of her mental anguish/distress against both Defendants. The court must also look to see if the repossession was done in a manner that would constitute a breach of the peace of conversion.

¶60. In granting the JNOV as to American Lenders, the trial court held:

> In *Hester v. Bandy*, 627 So.2d 833, 840 (Miss.1993), the Court held that "simply going upon the private driveway of a debtor and taking possession of secured collateral, without more, does not constitute "breach of the peace"; however, this is the limit of the right to repossess without instituting legal action." citing Code 1972, § 75-9-503. In *Hester*, the debtor actually physically resisted the repossession, this terminated the repossessor's right to repossess without going through the legal process, and this was considered a breach of the peace. In *McComb Equipment Co., Inc. v. Cooper*, 370 So.2d 1367 (Miss. 1979), the Court held that "Self-help repossession as permitted to secured creditors under Mississippi Code is not tantamount to a taking of property without

due process of law." citing Code 1972, § 75-9-503 (current through end of 2002); U.S.C.A. Const. Amend. 14. As to conversion, the Court held in *Johnson v. Stinson*, 418 So.2d 805 (Miss., 1982) that when repossession was done *"peacefully and in accordance with statute, there was no conversion*." ...

Defendant, American Lenders, did the actual repossession on the instruction of GMAC, and did so without a breach of peace. Under *Hester* and *McComb Equipment Co.*, the Defendant, American Lenders, had the right to repossess the Mustang, as long as they did not create a breach of the peace. The plaintiff failed to put on credible evidence that the repossession was done in violation of the statute and not done peacefully. There was no credible evidence put forth to give any reason why American Lenders should not have followed GMAC's instructions. By following fellow Defendant, GMAC's, instructions and doing so without a breach of peace, none of the actions taken by Defenant, American Lender's, can be seen as "extreme or outrageous." And, once again, the only evidence of emotional distress that Plaintiff put forward is her own testimony that she lost sleep and had some bad dreams. Accordingly, under *Gamble*, *Morrison*, and *American Bankers*, this court holds that a judgment for emotional distress cannot rest upon just those things.

¶61.    Wilson relies upon *Hester v. Bandy*, 627 So.2d 833 (Miss. 1993), to support her claim for breach of peace. However, the facts in *Hester* differ from those found here. In *Hester*, the repossession occurred at 3:00 a.m. *Id*. at 835. Evans moved the Hesters' Camaro in order to get to the Ford van. *Id*. Mr. Hester awoke to find his van being attached to the wrecker. *Id*. Hester protested and pursued Evans and fell into a ditch receiving injuries. *Id*. Hester's injuries included a torn rotator cuff to his right shoulder and a scratch to his left knee. *Id*.

¶62.    The Court in *Hester* found that Evans breached the peace in repossessing the van. The Court stated:

Evans' decision to repossess the van in the **early morning hours** from the Hester residence was deliberate. His purpose, of course, was to make a "quick snatch" of the van and get away, all without the knowledge of the Hesters. This was a **tactic which guaranteed generating fright or anger**, or both, if discovered in progress by the Hesters. It was fraught with the **peril of provoking a breach of the peace** of the most serious kind.

19

When Evans was in fact discovered and Hester attempted to physically resist the repossession, this terminated Evans' right to continue, because in doing so he caused a breach of the peace.

*Hester*, 627 So.2d at 841 (emphasis added).

¶63. However, the Court also stated "simply going upon the private driveway of the debtor and taking possession of secured collateral, without more, does not constitute a breach of the peace." *Id*. at 840. *See **Commercial Credit Co. v. Spence***, 185 Miss. 293, 297, 184 So. 439, 441 (1938) (holding that "the right to take the property from the possession of the other party does not justify the use of force to take it, - it must be done without force or violence."). *See **Dearman v. Willams***, 235 Miss. 360, 109 So.2d 316, 320-21 (1959) (entering a private driveway to repossess a vehicle, without the use of force, does not constitute breach of peace). In ***Commercial Credit Co. v. Cain***, 190 Miss. 866, 1 So.2d 776, 777 (1941), the debtor gave custody and control of the car to her husband who was not a party to the loan. This Court held that there was no breach of the peace by repossessing the car from a public place with the debtor's husband present and objecting. *Id*.

¶64. In the case at hand, American Lenders did not use any surprise tactics to repossess the car as used in *Hester*. The repossession agent, Gay, testified that when he arrived at Wilson's home on January 8, 1998, the Mustang was parked at Wilson's trailer, but Wilson was not at home. A little girl arrived at the door and told Gay that Wilson would be back soon. Gay asked the child if they could wait outside for Wilson to return home. Gay drove his truck approximately 100 feet away from the residence and waited for Wilson to arrive home. Gay testified that they waited approximately 15 to 30 minutes for Wilson to arrive. According to Gay, the repossession occurred around 7:00 p.m. He stated that he chose not to repossess the Mustang until Wilson returned home in order not to excite the little girl by hooking up to the Mustang and to allow Wilson to remove her personal belongings from the vehicle.

20

¶65. Gay testified that Wilson told him they could have the car, and he assisted Wilson in removing her personal belongings. Gay testified that Wilson said, "Well, that's fine. I just purchased this one [Saturn] from Herrin-Gear, and there's the Mustang. I can't afford it anyway." Gay testified that Wilson later said that she purchased the Saturn because the Mustang ran hot and she could not pay for it anyway. Gay testified that Wilson went inside the trailer to get the Mustang's keys and returned 3 or 4 minutes later with the keys. Wilson's sister asked to review the paperwork regarding the request for repossession of the Mustang. Gay testified that he allowed Wilson to review the paperwork but not her sister since she was not involved. According to Gay, Wilson saw James's sister, Patricia, ride back by the trailer. Wilson and her sister made comments that they were angry at Patricia riding by the trailer.

¶66. Gay testified that he did not curse either Wilson or her sister. There was no physical altercation involved in the repossession. Gay stated that Wilson never asked for the keys back or that he not take the car.

¶67. Wilson's sister, Hedrick, testified that her sister was threatened by the repossession agents, but she could not articulate any specific threat. She could not state any specific curse words that were allegedly spoken.

¶68. Wilson testified that she was not touched by either of the repossession agents. She admitted at trial that she relinquished the Mustang's keys to the repossession agents. However, she claimed at trial that she objected to surrendering the keys.

¶69. Wilson never made any allegations of American Lenders' breach of peace until she filed suit against American Lenders over two years after the repossession occurred. In fact, Wilson did not reference the alleged breach of peace by American Lenders in her original complaint filed against GMAC. American Lenders contends that Wilson only sued it for the sole purpose of her avoiding diversity of citizenship

21

jurisdiction and removal to federal court. American Lenders also argues that it was retained by GMAC to repossess the Mustang and that it merely followed the instructions sent to it by GMAC to accomplish the repossession.

¶70. Furthermore, Wilson's original attorney, Dulaney, never made reference to any altercation or breach of peace by American Lenders during the repossession. The record also does not reflect that Dulaney ever dealt with American Lenders regarding the repossession, only GMAC. The evidence demonstrates that Dulaney informed GMAC that Wilson did not want to keep the Mustang and that Wilson wanted a complete refund of the extension payment. He made no contact with American Lenders as to its alleged conduct.

¶71. We find that the trial court did not err in determining that no credible evidence existed to support the recovery awarded by the jury against American Lenders for breach of the peace. This assignment of error is without merit.

## B. Emotional Distress

¶72. Wilson contends that in its holding sustaining American Lenders' motion for JNOV, the trial court erred by determining that Wilson was not entitled to recovery from American Lenders on her claim of emotional distress. The jury only specifically found American Lenders "guilty of breach of peace." However, Wilson argues that due to American Lenders' breach of the peace in the repossession of the Mustang, she suffered emotional distress. The trial court stated:

> By following fellow Defendant, GMAC's, instructions and doing so without a breach of peace, none of the actions taken by Defendant, American Lender's (sic), can be seen as "extreme or outrageous." And, once again, the only evidence of emotional distress that (sic) Plaintiff put forward is her own testimony that she lost sleep and had some bad dreams. Accordingly, under *Gamble*, *Morrison*, and *American Bankers*, this [c]ourt holds that a judgment for emotional distress cannot rest upon just those things.

22

¶73. As Wilson's argument as to emotional distress by American Lenders overlaps with her previous arguments made in this opinion as to GMAC, we will not restate the legal and factual discussion already provided in Issue I. Furthermore, as the facts surrounding the repossession and the breach of peace are provided in Issue II, we will not restate that discussion finding that there was no credible evidence to support an award against American Lenders for breach of the peace.

¶74. Based on the lack of demonstrable evidence of any physical manifestation or physical harm and the lack of evidence of any extreme or outrageous conduct by American Lenders during the repossession, we find that the trial court did not err in granting JNOV as to the $1,000,000 award against American Lenders. The evidence does not support Wilson's recovery under a claim of emotional distress. This assignment of error is without merit.

### III. Wilson's Motion to Alter or Amend Final Judgment

¶75. Wilson contends that the trial court erred in immediately reducing the jury award of $2,500,000 against GMAC by entering a final judgment for $75,000. The trial court denied Wilson's motion to alter or amend the final judgment. In the final judgment, the trial court stated:

> The [c]ourt reduced the jury verdict against General Motors Acceptance Corporation to $75,000.00 pursuant to Plaintiff's affidavit which stated she would not seek any amount in excess of $75,000.00 against GMAC.

¶76. Wilson's affidavit to seek not in excess of $75,000 was provided to defeat removal to federal court as discussed in the procedural history section of this opinion.

¶77. This Court finds that since Issue I of this opinion found that the trial court did not err in granting GMAC's motion for JNOV to eliminate any award against GMAC, this issue is moot. Therefore, we need not address this issue.

### IV. Punitive Damages

23

¶78. Wilson contends that the trial court erred by not submitting punitive damages to the jury. GMAC argues that Wilson did not object to the failure to conduct a punitive damages phase of the trial. GMAC states that "following receipt of the jury's verdict on compensatory damages, the plaintiff made no request to the trial court that a punitive damages phase be held." Wilson also did not mention punitive damages in her post-trial motion to alter or amend the judgment. Therefore, GMAC contends Wilson is barred on appeal from raising the issue of punitive damages. *See Frierson v. Delta Outdoor, Inc.*, 794 So.2d 220, 223 (Miss. 2001) (the trial court will not be held in error unless it has had an opportunity to pass on the question).

¶79. Wilson argues that the trial court considered the jury's award to be both a punitive and compensatory award. However, Wilson admits that the record does not reflect that the trial court allowed the jury to consider punitive damages. Wilson further acknowledges that "it is unclear whether the trial court considered the jury verdict a compensatory and punitive damage award although the jury was only instructed to return a verdict on compensatory damages." The only instruction given to the jury was on compensatory damages.

¶80. In *Brown v. North Jackson Nissan, Inc.*, 856 So.2d 692, 695 (Miss. Ct. App. 2003), the Mississippi Court of Appeals recently addressed this specific situation regarding the waiver of any right to request punitive damages:

> In this case, the prompt consideration of the propriety of punitive damages was not undertaken. After the jury returned its verdict, the court inquired if there was "[a]nything further from the plaintiff at this time in connection with the verdict." Counsel replied that, "I have a motion." However, there is no indication as to what that motion might have been...
>
> **Brown now contends that the trial court erred in not automatically proceeding to take up an inquiry regarding punitive damages as outlined in Section 11-1-65 of the Mississippi Code without any prompting from counsel.** He points out that the statute contains the mandatory term "shall" rather than

"may," and contend that the prayer for punitive damages in his complaint together with his request for a punitive damages instruction was all that was required to compel the court to take up the matter of punitive damages at the proper time. The trial court, when presented with that proposition in a posttrial motion hearing, determined that Brown had waived his right to pursue punitive damages when he failed to affirmatively assert that right when given the opportunity after the jury returned a verdict in his favor as to actual damages....

Alternatively, Brown suggests that the court's failure to take up punitive damages affected a fundamental right in the fair conduct of the trial and, thus, ought to be noted by this Court under the plain error doctrine whether or not we find the issue procedurally preserved for appellate review. We disagree with both contentions....

Even assuming for sake of argument that the court erred when it failed to take up punitive damages without any further prompting from Brown, it is a fundamental concept that errors committed in the conduct of the trial must be timely raised. *Mitchell v. Glimm*, 819 So.2d 548, 552 (¶11) (Miss.Ct.App.2002) (citing *Gatlin v. State*, 724 So.2d 359, 369 (¶43) (Miss. 1998)). One of the beneficial purposes of the rule is that it affords the trial court an opportunity to correct the error at a time when it can yet be dealt with and thereby avoid the unnecessary waste of limited judicial resources that would be required to retry the matter. *Id*. Thus, the price a litigant pays for failing to promptly raise a perceived error affecting the conduct of the trial at a time when corrective action remains a possibility is that the error is deemed to have been waived. *Id*.

In the case before us, the plaintiff had every opportunity, while the jury was still empaneled, to raise the issue of punitive damages....

Because Brown has been made whole insofar as it lies within the power of the judiciary, **we do not think the failure of the trial court to inquire into the appropriateness of punitive damages in the circumstances of this case raises an issue regarding the denial of fundamental rights of a litigant that is necessary to consider an alleged error under the plain error doctrine**.

*Brown*, 856 So.2d at 695-97 (emphasis added).

¶81.    We agree with the Court of Appeals and find that this issue is procedurally barred on appeal.

## CONCLUSION

¶82.    For all the foregoing reasons, the judgment of the Circuit Court of Claiborne County is affirmed.

¶83.    **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**