950 So.2d 238 (2007)
Ruby Lane Mabry SPENCER, a/k/a Ruby Lane Mabray Spencer, Individually and as Executrix of the Estate of Ethel Lucille Mabry Hudspeth, Deceased, Appellant
v.
Eva Mae HUDSPETH, Joanne Hudspeth Sealy, and Libby Red Ross, Appellees.
No. 2006-CA-00058-COA.
Court of Appeals of Mississippi.
February 27, 2007.
*239 Robert Q. Whitwell, Ashland, attorney for appellant.
Leigh Ann Darby, Senatobia, attorney for appellees.
Before LEE, P.J., BARNES and ISHEE, JJ.
ISHEE, J., for the Court.
¶ 1. On December 11, 2005, the Chancery Court of Tate County entered an order denying Ruby Lane Mabray Spencer's motion to set aside a warranty deed of gift from Ethel Mabray Whitsell Hudspeth to Montie L. Hudspeth that conveyed forty acres of land. The court ruled that the deed shall remain in full force and effect. Aggrieved by the judgment, Spencer appeals. Finding error, we reverse and render.

FACTS
¶ 2. The forty acres of land that is in dispute was acquired by Ethel Hudspeth in 1941. Ethel first married R.M. Whitsell, and this forty acres was acquired by Ethel as part of the divorce proceedings between her and Mr. Whitsell. Ethel subsequently married Montie L. Hudspeth in February of 1946. The couple never had children. The forty acres adjoined land of Ethel's brother, Walter Mabray, who is the father of Ruby Lane Mabray Spencer. *240 Thus, Ethel is the paternal aunt of Ruby Spencer.
¶ 3. In June of 1972, Ethel prepared a will in which she named her niece Ruby Spencer as executrix, sole beneficiary, and devisee of her estate. The forty acres of land, which is the main conflict between the parties, was included in this will.
¶ 4. In July of 1983, Ethel had a stroke and suffered a heart attack. In 1984 she broke her hip. After these two incidents, Ethel was in poor health and was virtually bedridden. Ruby testified that after Ethel's stroke and the breaking of her hip, Ethel was disoriented, very weak, and frail. Because of Ethel's infirmity, Ruby, her two sisters, and Montie took care of her. In April of 1985, Ethel was placed in a nursing home in Sardis, Mississippi. Multiple witnesses testified that Ethel was unable to communicate and was non-responsive after being placed in the nursing home.
¶ 5. Prior to Ethel's poor health, she was a very independent and capable person. She was the one who mainly handled her and Montie's financial affairs. According to Ruby, Montie was not capable of handling the financial affairs. Ruby testified that Montie was poorly educated. She further stated that he relied on his brother and sister-in-law, Marvin and Eva Hudspeth, to help him with financial matters and to drive him places.
¶ 6. Montie died on October 30, 1988, and Ethel died three months later on January 18, 1989. On October 26, 1988, four days prior to his death, Montie conveyed his interest in the forty acres to his brother, Marvin Hudspeth. The appellees are Marvin Hudspeth's heirs at law, including his widow, Eva Hudspeth. Prior to Ethel's death, Chancellor Leon E. Hannaford, Jr., made Ruby conservator of Ethel's estate. Ruby testified that she discovered a deed, which was dated June 30, 1986, that conveyed Ethel's interest in the forty acres to Montie. Ethel signed her name "Etheld" on the deed as opposed to "Ethel." The deed was notarized by Naomi Baker, who is the sister of Montie's sister-in-law, appellee, Eva Hudspeth. Naomi Baker testified that Ethel was not present when she notarized the signature on the deed. Ruby also testified that she discovered an account that listed Ethel, Montie, and Marvin as the account holders. Ruby further stated that a $10,000 check was written out of the account to Helen Doran, who is Marvin's daughter. In addition, she said that a $5,000 check was signed by Montie and Marvin and given to Marvin. According to Ruby, various savings bonds were also unaccounted for, and the beneficiary of Ethel's retirement funds, who was Ruby, was changed leaving the funds to Montie and Marvin. Lastly, the record indicates that Montie paid an attorney, Kirk Moore, to draft a power of attorney. Moore testified that Montie and Marvin came to his office and asked him to draft the deed that conveyed the forty acres to Montie.
¶ 7. Ruby argues that Ethel was incapable of understanding the nature of such transactions and that she was not competent to make such decisions. The chancellor ruled that the deed was valid. Aggrieved by the chancellor's ruling, Ruby appeals and asserts the following issues for this Court's review: (1) whether or not a confidential and/or fiduciary relationship existed between Ethel and Montie Hudspeth that created an automatic presumption that the June 30, 1986 deed was invalid, thus shifting the burden of proof to the defendants to prove, by clear and convincing evidence, that the deed was valid; and (2) whether or not Ethel Hudspeth had full knowledge and deliberation of her actions and the consequences of those actions.

*241 STANDARD OF REVIEW
¶ 8. Our standard of reviewing the decision of a chancellor is well settled: "the findings of a chancellor will not be disturbed by this Court unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Ward v. Ward, 825 So.2d 713, 715(¶ 5) (Miss.Ct.App.2002).

ISSUES AND ANALYSIS
I. Whether or not a confidential and / or fiduciary relationship existed between Ethel and Montie Hudspeth that created an automatic presumption that the June 30, 1986, deed was invalid, thus shifting the burden of proof to the defendant to prove, by clear and convincing evidence, that the deed was valid.
II. Whether or not Ethel Hudspeth had full knowledge and deliberation of her actions and the consequences of those actions.
¶ 9. Due to the similarity of these two issues, we will discuss them together. To begin we note that there are two doctrines of undue influence in Mississippi that, if proved, may invalidate a deed: traditional undue influence and confidential relationship. The chancellor found that undue influence was inapplicable; however, he did not decide whether a confidential relationship existed between Ethel and Montie. If there was such a relationship, it would constitute a separate ground under which a court may find undue influence. Greenlee v. Mitchell, 607 So.2d 97, 105 (Miss.1992). More specifically, finding that a confidential relationship exists creates a presumption of undue influence that a grantee must rebut to show the validity of a deed. Id.
¶ 10. The Supreme Court stated that the first question in deciding whether a party's actions constituted undue influence was to determine if there existed a confidential relationship between the grantor and the grantee. Smith v. Smith, 574 So.2d 644, 651 (Miss.1990). As such, it was in error to find the deed was not a result of undue influence without taking into account whether there existed a confidential relationship.
¶ 11. A confidential relationship is defined as follows:
Whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of the mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.
Foster v. Ross, 804 So.2d 1018, 1022-23(¶ 15) (Miss.2002) (citing Madden v. Rhodes, 626 So.2d 608, 617 (Miss.1993)). The Mississippi Supreme Court has set out factors to be considered when determining whether or not a confidential relationship exists. These factors are (1) whether one person has to be taken care of by another, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains a joint account with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and the other. In re Moran v. Necaise, 821 So.2d 903, 906-07 (Miss.Ct.App.2002).
¶ 12. After Ethel became ill, she had to be taken care of. Montie was responsible for caring for Ethel. Ethel and Montie had been married for approximately forty *242 years, so it is evident that the two maintained a close relationship. Montie helped care for Ethel prior to her being placed in the nursing home and continued to visit her regularly after she was admitted. After reviewing the record, it is evident that a joint account was maintained, that Ethel was physically and mentally weak, that she was of advanced age and in poor health, and that a power of attorney had been established. Based on this, we are of the opinion that a confidential relationship existed between Ethel and Montie Hudspeth.
¶ 13. In Madden v. Rhodes, 626 So.2d 608, 618 (Miss.1993), the Supreme Court stated that when a confidential and/or fiduciary relationship exists that there is an automatic presumption of undue influence regarding an inter vivos gift. The Supreme Court further stated, "When circumstances give rise to a presumption of undue influence, the burden of proof shifts to the grantee to establish by clear and convincing evidence the validity of the gift." Id. at 624. In the present case, this creates a presumption that the deed from Ethel to Montie was a product of undue influence. That deed is invalid unless there is clear and convincing evidence to rebut the presumption.
¶ 14. The Supreme Court has established a three-pronged test to overcome the presumption of undue influence. The three prongs are: (1) that the grantee/beneficiary acted in good faith, (2) that the grantor had full knowledge and deliberation of his actions and the consequences of those actions, and (3) that the grantor exhibited independent consent and action. Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984).
¶ 15. To determine whether or not a gift was executed in good faith the Mississippi Supreme Court has outlined the following five factors: (1) determination of the identity of the initiating party in seeking preparation of the instrument, (2) the place of the execution of the instrument and in whose presence, (3) the consideration and fees paid, if any, (4) by whom paid, and (5) the secrecy and openness of the execution of the instrument. Id. Kirk Moore testified that Montie and his brother Marvin came to his office and asked him to draft the deed. Moore did not witness Ethel's signing of the deed. Moreover, Naomi Baker, the notary, stated that Ethel was in the nursing home and not present when the deed was notarized. Montie paid the fees to have the deed drafted and the consideration was for $10. The deed was executed on June 30, 1986, but was not recorded until December 29, 1986. Furthermore, Ruby testified that she had no knowledge of the deed until she was named conservator in December of 1988. After applying this test, we are of the opinion that the grantee/beneficiary did not act in good faith.
¶ 16. This case is littered with suspect instances that suggest that Ethel did not have full knowledge and deliberations of her actions or the consequences of those actions. Ethel's signature on the deed was misspelled, she was not present when the deed was notarized, and multiple witnesses stated that Ethel did not come across as having a sound mind after having been placed in the nursing home. It appears that both Montie and Marvin had more to do with the deed coming to fruition than Ethel. Ethel did not exhibit independent consent and action. There was no independent advice or counsel given to Ethel by any person. We are of the opinion that Ethel did not have full knowledge and deliberation of her actions or the consequences thereof. Based on these findings, Eva did not rebut the presumption, by clear and convincing evidence, that the deed was the product of undue influence.
*243 ¶ 17. The court erred in failing to consider, in the analysis of undue influence, whether a confidential relationship existed. We find there did exist between Ethel and Montie a confidential relationship, which gives rise to a presumption of undue influence in the creation of the deed conveying the forty acres. Since Eva failed to rebut this presumption by clear and convincing evidence we find that the inter vivos deed to Montie was invalid. We reverse and render judgment in favor of the appellant.
¶ 18. THE JUDGMENT OF THE CHANCERY COURT OF TATE COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR.