5 So.3d 427 (2008)
In the Matter of the ESTATE OF Earsel Rayburn POPE, Deceased.
Juanita Sharp Anderson Allen Pope, Appellant
v.
Cathy White, Judy O'Berry and Teresa Williamson, Appellees.
No. 2007-CA-00199-COA.
Court of Appeals of Mississippi.
May 20, 2008.
Rehearing Denied December 9, 2008.
Certiorari Denied March 26, 2009.
*429 James A. Williams, attorney for appellant.
Walton Wade White, Philadelphia, Terry L. Jordan, Steven Detroy Settlemires, Philadelphia, attorneys for appellees.
Before MYERS, P.J., GRIFFIS, ROBERTS and CARLTON, JJ.
CARLTON, J., for the court.
¶ 1. This case involves the contest of the will of Earsel Rayburn Pope (Earsel). The contestants, Cathy White, Judy O'Berry, and Teresa Williamson (collectively, "the Contestants"), are the natural daughters of Earsel. The proponent of the will is Juanita Sharp Anderson Allen Pope (Juanita), who was married to Earsel at the time of his death and was named as the sole beneficiary under the purported will. On November 3, 2006, the Chancery Court of Neshoba County entered a judgment in favor of the Contestants pursuant to a jury verdict finding that the will was not the true last will and testament of Earsel.
*430 ¶ 2. Aggrieved, Juanita appeals and argues that the chancellor erred in denying her motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. We find that the record contains substantial evidence supporting the jury's verdict. Therefore, we find no error and affirm.

FACTS
¶ 3. Earsel passed away on March 29, 2004. He was survived by the Contestants and his wife, Juanita. Before marrying Juanita, Earsel was married to Elizabeth Earlene Vincent Pope (Earlene) for over fifty years, until she passed away in March 2001. The Contestants were born into the marriage between Earsel and Earlene. At the time of Earlene's passing, Earsel was seventy-three years old and suffered from leukemia, Alzheimer's, dementia, heart problems, diabetes, arthritis, and shoulder problems. Earsel's medical condition rendered him dependent on the assistance of others. He took more than twenty-one pills a day and was under hospice care. After Earlene's passing, the Contestants jointly cared for Earsel by helping him with such tasks as: driving, cooking, laying out his medicine, and administering his insulin shots.[1] Although the record is unclear, it appears that sometime during 2002, Earsel moved in with Williamson, who became his primary caregiver. In May 2003, Earsel executed a power of attorney in Williamson.
¶ 4. Williamson would occasionally hire others to sit with Earsel when she and her husband were unable to do so. In approximately September 2003, Williamson first contacted Juanita to sit with Earsel. It is unclear how many times Juanita sat with Earsel; however, Williamson testified that she contacted Juanita at least twice. Although Juanita denied ever being paid to sit with Earsel, she admitted that she had received money from Williamson on two occasions. On one of these occasions, Juanita received a check for $100, which was dated September 18, 2003, and contained a notation that the check was made for "sitting." Juanita and Earsel began dating in August 2003, at which time, Juanita moved in with Earsel and became his primary caregiver. After a brief courtship, Juanita married Earsel on October 9, 2003. According to the Contestants, Juanita would not allow them to be alone with Earsel when they came to visit him both during Juanita and Earsel's courtship and after their marriage.
¶ 5. A few days after the marriage, Juanita called attorney Robert Thomas and set an appointment to discuss preparing a will for Earsel. On October 13, 2003, the day of the appointment, Juanita drove Earsel to Thomas's law office and accompanied him inside. According to Thomas, Juanita began asking him about the law in Mississippi regarding the disinheritance of children. Regarding this conversation, Thomas stated that:
When they came in, [Juanita] was with him; and they sat down. She started asking me some questions about the law and  and what could be done with regard  primarily, I think she was concerned or she had knowledge of the law in Texas and Louisiana and what could be done with regard to children and that sort of thing in Mississippi. I advised her that I didn't need to talk with her, that I needed to talk with [Earsel]. I excused her, and she went outside. Then [Earsel] and I talked, and he advised me that he wanted to do [sic] the will leaving everything to [Juanita] and *431 her as executor and revoke the power of attorney [in Williamson], and that's what I did.
Although Thomas testified that Earsel expressed a desire to leave Juanita his entire estate, he stated that no discussion was had as to whether Earsel understood that he was leaving nothing to his daughters. After Juanita and Earsel left, the will was prepared.
¶ 6. The following day, October 14, 2003, Juanita transported Earsel to Thomas's office to execute the will. Juanita was not present in the room when Earsel signed the will; she was standing outside the door. Earsel signed the will in the presence of Heather Irby and Susan Alford, legal assistants in Thomas's law office. Alford recalled that "[h]e was very quiet. He just-[w]e gave it to him and asked him to read over it, and he did so and then asked us to watch him sign it." Irby stated that Earsel did not ask anyone to watch him. The will was executed naming Juanita as the sole beneficiary. The document revoking the power of attorney in Williamson was dated October 16, 2003; it is unclear from the record if this document was also executed on October 14, 2003. Although the record is unclear, it appears that the will was given to Earsel at Thomas's office. However, Juanita testified that she placed the will in a locked safe at her house when she and Earsel returned home from Thomas's office.[2]
¶ 7. Also, the week after the marriage, Terrell Flint, Earsel's financial advisor, met with Earsel and Juanita to remove $50,000 out of an annuity Earsel kept with New York Life. Later, on December 18, 2003, Flint again met with Earsel and Juanita concerning the annuity. On this date, the remaining balance was withdrawn  approximately $200,000. As Flint left this meeting, he asked Juanita if she could use his services to reinvest the money in another account. Flint testified that "she said, no, she was going to put the money somewhere it couldn't be found."
¶ 8. After Earsel's passing, O'Berry and White filed a caveat against probate in common form.[3] Juanita filed a petition to probate the will and requested a jury trial, which was held from October 16, 2007, to October 18, 2007. At the close of the evidence, the jury returned a verdict in favor of the Contestants, finding that the will was not the true last will and testament of Earsel. Juanita's post-trial motions were denied. She now appeals.

DISCUSSION

Whether the chancellor erred in denying Juanita's motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

A. Standard of Review
¶ 9. We review the denial of a motion for judgment notwithstanding the verdict (NOV) de novo. Wilson v. Gen. Motors Acceptance Corp., 883 So.2d 56, 64(24) (Miss.2004). We "consider the evidence in the light most favorable to the non-moving party, giving that party the benefit of all favorable inferences that reasonably may be drawn therefrom." Id. at 63(21). This Court must reverse and render "[i]f the *432 facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict...." Id. at (22) (quoting Corley v. Evans, 835 So.2d 30, 37(19) (Miss.2003)). However, we will affirm "if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions...." Id. at (23).
¶ 10. We review the trial court's denial of a motion for new trial under the abuse of discretion standard of review. Miss. Transp. Comm'n v. Highland Dev., LLC, 836 So.2d 731, 734(10) (Miss.2002) (citing Alpha Gulf Coast, Inc. v. Jackson, 801 So.2d 709, 723(40) (Miss.2001)). On appeal, "we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Bush v. State, 895 So.2d 836, 844(18) (Miss.2005) (citation omitted).

B. Undue Influence
¶ 11. A presumption of undue influence arises "where a confidential relation exists between a testator and a beneficiary under his will, and the beneficiary has been actively concerned in some way with the preparation or execution of it...." Croft v. Alder, 237 Miss. 713, 722-23, 115 So.2d 683, 686 (1959); see also, Smith v. Averill, 722 So.2d 606, 612(18) (Miss.1998) ("Suspicious circumstances surrounding the creation of the will also raise the presumption.") (citing Pallatin v. Jones, 638 So.2d 493, 495 (Miss.1994)); Genna v. Harrington, 254 So.2d 525, 529 (Miss.1971) (In order for a presumption of undue influence to arise against a testator's spouse, "it must be shown that the devisee spouse used undue methods for the purpose of overcoming the free and unrestrained will of the testator...."). The party asserting the existence of a confidential relationship bears the burden of proving it by clear and convincing evidence. Mullins v. Ratcliff, 515 So.2d 1183, 1191-92 (Miss.1987). A confidential relationship "arises when a dominant, over-mastering influence controls over a dependent person or trust justifiably reposed." Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984) (citing Hendricks v. James, 421 So.2d 1031, 1041 (Miss.1982)). The factors to be considered in determining whether a confidential relationship exists are:
(1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
Holmes-Pickett v. Holmes-Price, 961 So.2d 674, 680(17) (Miss.2007) (quoting Wright v. Roberts, 797 So.2d 992, 998(18) (Miss.2001)).
¶ 12. Juanita argues that the Contestants failed to prove by clear and convincing evidence that there was a confidential relationship so as to raise a presumption of undue influence. However, she fails to cite any authority in support of this argument. Therefore, we need not address this issue on appeal. Boutwell v. Boutwell, 829 So.2d 1216, 1223(29) (Miss. 2002) ("Failure to cite authority in support of claims of error preludes this Court from considering the specific claim on appeal.") (quoting Pickering v. Industria Masina I Traktora, 740 So.2d 836, 848(55) (Miss.1999)).
*433 ¶ 13. However, notwithstanding the procedural bar, we find substantial evidence to support a finding that a confidential relationship existed between Juanita and Earsel. In the two months preceding the will's execution, Juanita cared for, became romantically involved with, and married Earsel, an individual of advanced age and declining physical and mental health, which rendered him dependent on the care of others. Moreover, the evidence clearly established that Juanita actively participated in the will's preparation. She called to make the initial appointment and drove Earsel to Thomas's office on both the day of the initial appointment and the day of the will's execution. Accordingly, we find that a presumption of undue influence arose.
¶ 14. Juanita next argues that she presented evidence sufficient to rebut the presumption of undue influence. Once a presumption of undue influence is established, the burden of proof shifts to the beneficiary to rebut the presumption with clear and convincing evidence of:
(1) Good faith on the part of the grantee/beneficiary;
(2) Grantor's full knowledge and deliberation of his actions and their consequences; and
(3) Advice of (a) competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest.
Murray, 446 So.2d at 578 (citations omitted). The third prong of Murray has been redefined to require that the proponent establish "that the grantor/testator exhibited independent consent and action." Mullins, 515 So.2d at 1193. In Mullins, the court explained:
[The three prongs of Murray] should not be understood as entirely separate and independent requirements that ought be rigidly exacted in every case. Undue influence is a practical, non-technical conception, a common sense notion of human behavior. As helpful as Murray may be to identify factors that ought be considered, common sense counsels against rigid, inflexible multi-part tests, particularly as the parties our law saddles with proof of the negatives are laymen, not legal technicians. Better that the scope of equitable principles be imperfectly defined than that justice be overborne by the weight of artificial rules.
Mullins, 515 So.2d at 1194. The Mississippi Supreme Court has recently instructed that "the testimony of the proponents or interested parties is not sufficient to rebut the presumption of undue influence." Holmes-Pickett, 961 So.2d at 681(19) (citing Pallatin, 638 So.2d at 495).

1. Good Faith
¶ 15. In determining whether the beneficiary acted in good faith, the following factors are considered: (a) who initiated procurement of the will, (b) where the will was executed and in whose presence, (c) the consideration paid, (d) who paid the consideration, and (e) the secrecy or openness of the will's execution. Smith, 722 So.2d at 612(22) (citing Pallatin, 638 So.2d at 495-97).
¶ 16. In the instant case, the substantial weight of the evidence supports the conclusion that Juanita did not act in good faith. Juanita initiated the will's procurement; she contacted Thomas and set an appointment to discuss preparing a will for Earsel. Juanita also drove Earsel to Thomas's law office twice, once to discuss the terms of the will, and a second time to execute the will. The record is unclear as to who paid for the will's execution. As to secrecy, the record reveals that the Contestants found out about the will shortly after its execution; however, the means by which *434 the Contestants became aware of the will are unclear. Further, Juanita locked the will in a safe in her own house.

2. Knowledge and Deliberation
¶ 17. In determining whether the testator acted with full knowledge and deliberation of his actions and the consequences of those actions, the following four factors are considered:
(a) his awareness of his total assets and their general value,
(b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution,
(c) whether non-relative beneficiaries would be excluded or included and,
(d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor on him and how susceptible to his influence.
Murray, 446 So.2d at 579.
¶ 18. The record contains little evidence bearing directly on the above-mentioned factors. Regarding Earsel's awareness of his assets and their value, the Contestants point out that Earsel suffered from leukemia, Alzheimer's, and dementia, among other things. Regarding Earsel's understanding of the will's effect on natural distribution, we again look to Thomas's testimony that "[Earsel] and I talked, and he advised me that he wanted to do [sic] the will leaving everything to [Juanita] and her as executor and revoke the power of attorney [in Williamson], and that's what I did." However, Thomas also stated that he did not question Earsel as to his understanding that he was leaving the Contestants nothing. After learning of the will, White asked Earsel why the Contestants' names were not in the will, to which Earsel responded, "Well, Sis, we'll change that." O'Berry testified that in a similar conversation Earsel said, "Sis, I have a lot of faith in [Juanita]; and I think she'll do the right thing by y'all." The evidence suggests that Juanita exercised a degree of control over Earsel's finances. Again the record is unclear, but it appears that Juanita's name was added to several of Earsel's accounts. Earsel was clearly dependant on Juanita, and the testimony suggests that he was susceptible to her influence.

3. Independent Consent and Action
¶ 19. Juanita testified that Thomas "was [her] attorney, too; and he was a friend of [hers]." Thomas had also known Earsel for a long time and had previously performed legal work for him, including the power of attorney in Williamson. Once again relevant is Thomas's testimony that "[Earsel] and I talked, and he advised me that he wanted to do [sic] the will leaving everything to [Juanita] and her as executor and revoke the power of attorney [in Williamson], and that's what I did." Beyond this, the record contains no details of the discussions between Earsel and Thomas; although, Thomas did admit that there was no discussion directly on the topic that the Contestants would receive nothing under the will. This Court has previously stated that "`[t]he participation of the beneficiary/grantee, or someone closely related to the beneficiary, arouses suspicious circumstances that negate independent action.'" Dean v. Kavanaugh, 920 So.2d 528, 537(46) (Miss.Ct.App.2006). To this end, Juanita's participation weighs against a finding that Earsel exercised independent consent and action.

CONCLUSION
¶ 20. From our review of the record, we find that there was substantial evidence *435 supporting the jury's determination that Earsel's will was the product of undue influence on the part of Juanita. We note that Juanita requested a jury trial, over the course of which, the jury was presented with a voluminous amount of evidence for their consideration. After hearing the evidence and judging its weight and the credibility of the witnesses, the jury returned a verdict against Juanita. We find the jury's verdict is supported by sufficient evidence in the record, and it is not against the overwhelming weight of the evidence. Therefore, we find that the chancellor did not err in denying Juanita's motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial.
¶ 21. THE JUDGMENT OF THE CHANCERY COURT OF NESHOBA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] In this regard, O'Berry testified that "[Earsel] was capable of giving his own shot, but he wasn't always able to see well enough to draw his own insulin up."
[2] To be clear, the living arrangements of Juanita and Earsel were as follows: Prior to the marriage, Earsel lived in a trailer with Williamson and her husband; Juanita lived in a trailer in close proximity. When Juanita began "dating" Earsel, she moved into the Williamson's trailer where Earsel was residing. It appears that the Williamsons moved out of the trailer around this time. Juanita continued to live in Earsel's trailer after the marriage.
[3] Williamson later joined as a contestant.