GRIFFIS, J.,
for the Court:
¶ 1. Mansfield Langston appeals the chancellor’s judgment setting aside the creation of certain joint tenancies with his wife, Patricia McDaniel Langston. He claims that the chancellor: (1) erred as a matter of law in finding that a confidential relationship existed between Mansfield and Patricia and (2) made certain findings of fact that are not supported by substantial credible evidence. We find that the chancellor applied the incorrect standard of law to the particular facts of this case; therefore, the judgment of the chancery court is reversed and rendered.
FACTS
¶ 2. Mansfield and Patricia were married on May 29,1994. At the time of marriage, Mansfield was forty-four years old, and Patricia was forty years old. This was the second marriage for both parties, and they both had children from previous marriages. Patricia suffered from several chronic health problems throughout the marriage including heart and kidney problems. In 2001, she was a class-action plaintiff and received a settlement following litigation involving the diet drug Phen-Phen.
¶ 3. From August 23, 1997, until March 11, 2002, the couple owned their marital home on Kentwood Lane, in Indianola, Mississippi, as joint tenants with the right of survivorship. On March 11, 2002, Patricia quitclaimed the marital home to Mansfield because Patricia had purchased a home on French Road, also in Indianola.
¶ 4. On March 15, 2002, Patricia executed a will naming Mansfield as executor. The will divided Patricia’s entire estate equally among her three adult children and one of her sisters. A clause in the will expressly stated that: “MANSFIELD LANGSTON, my husband, has his own estate in his name, therefore no provision for him is made in this will.” At the time this will was executed, Patricia owned the French Road home solely in her name.
¶ 5. On May 9, 2002, three deeds were prepared by the Langstons’ attorney, Richard Noble. The first deed was executed by Patricia and created a joint ten *659 ancy with the right of survivorship in the French Road home, which then became the couple’s marital home. The second deed conveyed the home on Kentwood Lane to Patricia’s mother, Ethel Williams. Mansfield testified that the home was sold to Williams at a discounted price. In the third deed, Williams sold and conveyed her home in Indianola.
¶ 6. On June 11, 2002, Patricia executed a second will that was identical to her first will except it named Patricia’s mother as executor instead of Mansfield. On September 4, 2003, Mansfield and Patricia executed a $200,000 certificate of deposit as joint tenants with the right of survivorship.
¶ 7. On May 11, 2005, Patricia died due to a sudden illness.[1] Patricia’s estate was opened by her mother. The estate sought to set aside the joint tenancies in the marital home and the certificate of deposit in order to bring those assets into the estate for distribution to the will beneficiaries— Patricia’s adult children and Patricia’s sister.
¶8. Following the trial, the chancellor found that a confidential relationship existed between Mansfield and Patricia. Therefore, the chancellor ruled that the burden shifted to Mansfield to prove by clear and convincing evidence that the creation of the joint tenancies was not the result of undue influence. The chancellor held that Mansfield did not meet this burden, and both joint tenancies were set aside and brought into Patricia’s estate.
STANDARD OF REVIEW
¶ 9. “This Court will not disturb a chancellor’s findings of fact in a will contest unless the findings are clearly erroneous, manifestly wrong, or the chancellor applied an incorrect legal standard.” In re Estate of Thornton v. Thornton, 922 So.2d 850, 852 (¶ 6) (Miss.Ct.App.2006). “Questions of law, however, are reviewed de novo.” Id.
ANALYSIS

Whether the chancellor erred as a matter of law in finding that a confidential relationship existed between MaEsfield and Patricia.

¶ 10. Mansfield claims that the chancellor erred as a matter of law in finding that Mansfield and Patricia were in a confidential relationship for the purpose of raising the presumption of undue influence. Specifically, Mansfield contends that the factors used by the chancellor to find a confidential relationship are factors that would be found in any trusting, healthy relationship between a husband and wife. Williams responds that the relationship between Mansfield and Patricia clearly met all of the factors which constitute a confidential relationship. Thus, Williams claims that the presumption of undue influence automatically applies to the two inter vivos transfers.
¶ 11. The supreme court defines a confidential relationship as:
Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.
Madden v. Rhodes, 626 So.2d 608, 617 (Miss.1993) (citation omitted). “[T]he relationship must reflect ‘a dominant, over *660 mastering influence [which] controls over a dependent person or trust justifiably reposed.’ ” Taylor v. Welch, 609 So.2d 1225, 1231-32 (Miss.1992) (quoting Mullins v. Ratcliff, 515 So.2d 1183, 1191-92 (Miss.1987)). The factors to be considered in determining whether a confidential relationship exists between the parties are:
(1) whether one person has to be taken care of by others,
(2) whether one person maintains a close relationship with another,
(3) whether one person is provided transportation and has their medical care provided for by another,
(4) whether one person maintains joint accounts with another,
(5) whether one is physically or mentally weak,
(6) whether one is of advanced age or poor health, and
(7) whether there exists a power of attorney between the one and another.
Thornton, 922 So.2d at 852-53 (¶ 7).
¶ 12. The chancellor examined each of these factors and made the following findings. Patricia suffered from a variety of health problems including chronic heart disease, kidney problems, asthma, gout, high blood pressure, and swelling of the feet. Mansfield helped Patricia get her medication and drove her to various doctors’ appointments. Mansfield testified that he and Patricia had a close relationship. The couple shared joint bank accounts during their marriage. The chancellor found that Patricia’s chronic health problems made her physically and mentally [2] weak, and although she was not of an advanced age, she did have poor health. Finally, both Mansfield and Patricia granted each other power of attorney.
¶ 13. The chancellor concluded that a confidential relationship existed between Mansfield and Patricia. We find substantial evidence to support the chancellor’s conclusion; however, our review does not end there. We must determine whether the chancellor correctly applied the presumption of undue influence as it relates to Mansfield and Patricia as husband and wife.
¶ 14. As the supreme court discussed in Madden, 626 So.2d at 618, the presumption of undue influence operates differently depending on whether a transfer occurs during the grantor’s lifetime or occurs through operation of the grantor’s will. The supreme court stated:
[T]he rules of law are different regarding gifts testamentary and gifts inter vivos where a confidential relationship exists between the testator/grantor and the beneficiary/grantee. The prior holdings of this Court indicate a presumption of undue influence only arises in the context of gifts by will when there has been some abuse of the confidential relationship, such as some involvement in the preparation or execution of the will. On the other hand, with a gift inter vivos, there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid.

Id.

¶ 15. Thus, a party claiming that an inter vivos transfer is void because of undue influence must show by clear and convincing evidence that a confidential re *661 lationship existed between the grantor and grantee/beneficiary. Estate of Hawkins v. Shiyou, 737 So.2d 432, 434 (¶ 9) (Miss.Ct.App.1999). When such a relationship exists, the presumption of undue influence arises automatically. Lancaster v. Boyd, 803 So.2d 1285, 1289 (¶9) (Miss.Ct.App.2002); Shiyou, 737 So.2d at 434 (¶ 9).
 ¶ 16. Once the presumption is established, the burden shifts to the grantee to rebut the presumption by clear and convincing evidence. 'Id. In order to overcome the presumption, the grantee must show that: (1) he or she exhibited good faith in the fiduciary relationship with the grantor; (2) the grantor had full knowledge and deliberation when he executed the deed; and (3) the grantor exhibited independent consent and action. Lancaster, 803 So.2d at 1289 (¶ 9).
¶ 17. . Here, the transfers at issue were inter vivos transfers. Therefore, once the chancellor found a confidential relationship, the presumption of undue influence automatically arose. No actual showing of undue influence on the part of Mansfield was required.
¶ 18. While we recognize that our supreme court has set forth such automatic presumption for inter vivos transfers, we also find that the supreme court has found it necessary to distinguish confidential relationships between spouses in a long-term marriage. In Genna v. Harrington, 254 So.2d 525, 528-29 (Miss.1971), the supreme court held that:
It is undoubtedly true that a husband or a wife may exercise undue influence upon the other spouse, but the mere fact that there is a close relationship between the parties in a marriage does not mean that one’s influence upon another is undue influence.
[[Image here]]
In order to set a will aside upon the grounds of undue influence on the part of a spouse, it must be shown that the devisee spouse used undue methods for the purpose of overcoming the free and unrestrained will of the testator so as to ■ control his acts and to prevent him from being a free agent.
¶ 19. Because it is clear that a husband and wife naturally influence each other as part of their marital relationship, there must be something more to show that such influence was undue. To presume undue influence here, solely based on the existence of a confidential relationship, would discourage certain benefits that are quite common and encouraged among spouses— assistance with health problems, transportation to doctors’ visits, joint accounts, reciprocal powers of attorney, and the most obvious factor — a close relationship.[3] Accordingly, we find that the legal standard used by the chancellor in this case was improper due to the long-term marriage of Patricia and Mansfield.
¶ 20. Our finding is supported by a brief examination of how the facts of this case relate to recent cases in which this Court addressed the issue of a confidential relationship between a husband and wife. First, in Spencer v. Hudspeth, 950 So.2d 238, 243 (¶ 17) (Miss.Ct.App.2007), this Court reversed the chancery court’s denial of a motion to set aside a deed on the ground of undue influence. Ethel Hud-speth executed a deed to forty acres of land to her husband, Montie Hudspeth. Id. at 240 (¶ 6). We found a confidential relationship existed between Ethel and *662 Montie because Ethel was physically and mentally weak. Id. at 241^2 (¶ 12). She had suffered a stroke, a heart attack, and a broken hip. She was bedridden, disoriented, and very weak. Id. at 240 (¶ 4). Ethel’s signature on the deed was misspelled, and Ethel had been in a nursing home for a year before the deed was signed. Id. at (¶ 6). The motion to set aside the deed was filed by Ethel’s niece after both Ethel and Montie were deceased.
¶21. The facts of Spencer are distinguishable from the facts in this case. Ethel’s signature, which was made while she was physically and mentally weak and a resident of a nursing home, was highly suspect. In the instant case, there is no question that Patricia executed the deed and the certificate of deposit. Both Noble, the attorney who prepared the deed, and Paul Townsend, the banker who prepared the certificate of deposit, testified that Patricia was competent, knowledgeable, and did not exhibit any mental weakness.
¶ 22. Next, in In re Estate of Chapman v. Chapman, 966 So.2d 1262, 1263 (¶¶ 1-2) (Miss.Ct.App.2007), this Court affirmed the chancellor’s ruling that no confidential relationship existed between husband and wife, Leslie and Betty Chapman. Gary Chapman, Leslie’s son who was disinherited by Leslie’s will, claimed that a confidential relationship existed between Leslie and Betty. Id. This Court noted that a close relationship was to be expected as an inherent part of a long-term marriage. Furthermore, the testimony revealed that Leslie was a very strong-willed man. Id. at 1264-65 (¶ 16). There was no evidence that Betty prevented Leslie from being a free agent in the signing of his will. Id. at (¶17).
¶ 23. Similarly, here, a close relationship is to be expected as part of Patricia and Mansfield’s long-term marriage. The two were married for eleven years, and the transfers at issue were not executed until eight years into the marriage. There was no evidence that Mansfield prevented Patricia from freely signing the deed or the certificate of deposit. In fact, Townsend testified that Patricia dominated the conversation regarding the certificate of deposit. There was ample testimony that Pati’icia was a strong-willed person.
¶ 24. Finally, in In re Estate of Pope v. White, 5 So.3d 427, 433 (¶ 13) (Miss.Ct.App.2008), we found substantial evidence to support the chancellor’s finding that a confidential relationship existed between husband and wife, Earsel and Juanita Pope. Earsel was a seventy-three-year-old, terminally-ill man suffering from several ailments including Alzheimer’s and dementia. Id. at 430 (¶ 3). Juanita became Ear-sel’s caregiver, and the two married after a very brief courtship. Within days of the marriage, Juanita set up an appointment with an attorney and drove Earsel to the appointment. Juanita met with Earsel and the attorney, and a will was prepared disinheriting Earsel’s children. The will left Earsel’s entire estate to Juanita. Id. at 431 (¶ 6).
¶ 25. The present case is clearly distinguishable from Pope because Patricia and Mansfield’s marriage was not contrived. While Patricia suffered from physical problems, the evidence established that she was a strong-willed person and mentally capable of making her own decisions. Pope is a clear example of a circumstance where the factors used to find a confidential relationship properly lead to the automatic presumption of undue influence between a husband and wife. Such is not the case here.
¶ 26. We further note that the chancellor found that Mansfield failed to rebut the presumption of undue influence by clear and convincing evidence. Again, the fac *663 tors used against Mansfield are inherent to the relationship between a husband and wife in a long-term marriage. For example, the fact that the attorney who prepared the deeds had also done other legal work for Mansfield was used against Mansfield. Also, the fact that Mansfield was a customer at the bank that held the certificate of deposit was used to prevent Mansfield from showing a lack of undue influence.[4] The chancellor found that Mansfield gave no consideration for the deeds. Further, Patricia only discussed the transfers with Mansfield and not her mother or sister. Each of these factors— using the same attorney or bank, lack of consideration, confidence in each other— are to be expected as part of a relationship between a husband and wife of eleven years.
¶27. The chancellor also found that Patricia did not understand the consequences that the inter vivos transfers would have on the distribution of her estate by will. However, had Mansfield predeceased Patricia, Patricia would have become the sole owner of the property. The property would have then been distributed to her children and sister via her will. Thus, Williams’s argument that the transfers were contrary to Patricia’s specific intent and made Patricia’s will null and void is incorrect. Moreover, the will does not bequeath specific property to the beneficiaries; instead, it gives all of Patricia’s “estate, real and personal, wheresoever situate, of which I may die, seized and possessed.”
¶ 28. We find that the chancellor’s application of the automatic presumption of undue influence based solely on the existence of a confidential relationship was improper based on the specific facts of this case. Mansfield and Patricia were married for eleven years. As part of- that marriage, they assisted each other with business, their health needs, and personal matters. The two shared a close relationship. Under these circumstances, their relationship alone is insufficient to void the joint tenancies created in their marital home and the certificate of deposit. Accordingly, the judgment of the chancellor holding such joint tenancies null and void is reversed and rendered.
¶ 29. THE JUDGMENT OF THE SUNFLOWER COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. IRVING, J„ DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., LEE AND MYERS, P.JJ.

. There were no medical records or testimony introduced at trial concerning Patricia’s cause of death. Despite this fact, the chancellor ultimately concluded that Patricia’s chronic health problems “eventually culminated in her death.”

. We- note that the chancellor's finding that Patricia was mentally weak was contrary to the testimony of Williams and two of the estate beneficiaries — Patricia’s son, Keith White, and Patricia's sister, April Frierson. Their testimony established that Patricia had no mental problems, was strong willed and strong minded, and that Patricia’s physical health problems did not affect her mental state.

. Our conclusion is emphasized by the chancellor’s finding under the factor of whether one person maintains a close relationship with another: “Mansfield and Patricia shared a close relationship, as the testimony of Mansfield indicated.' The Court accepted Mansfield’s version inasmuch as it is a statement against interest.”

. There was undisputed testimony from an employee of Guaranty Bank, the holder of the certificate of deposit, that Patricia did not want to purchase the certificate of deposit from her regular bank because one of her relatives was employed at that particular bank.